Filed 5/26/16  Nickel v. Staples Contract & Comm. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| BOBBY DEAN NICKEL, | B257420 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC481391) |
| v. |  |
| STAPLES CONTRACT & COMMERICIAL, INC., et al., |  |
| Defendants and Appellants. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.

Littler Mendelson, Keith A. Jacoby, Janel R. Ablon; Sidley Austin, Mark E. Haddad and Aimee G. Mackay for Defendants and Appellants.

Shegerian & Associates, Carney R. Shegerian and Jill P. McDonell for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendants Staples Contract & Commercial Inc. (Staples) and its parent company, Staples Inc. (Staples Inc.), (collectively, Defendants) appeal from the judgment after the jury awarded former-employee Plaintiff Bobby Dean Nickel $3.2 million in compensatory damages and $13 million in punitive damages for age discrimination in violation of the Fair Employment and Housing Act (FEHA). Defendants assert that they were entitled to judgment notwithstanding the verdict (JNOV) because Plaintiff failed to prove that age discrimination was a substantial motivating factor in his termination. Defendants also argue that an erroneous jury instruction and evidentiary ruling require reversal. Defendants lastly contend that the punitive damages award was not supported by substantial evidence and violated due process. We affirm on all grounds. We conclude that substantial evidence supports the verdict and the instructional error was not prejudicial. The court did not abuse its discretion in making the evidentiary ruling. Lastly, the punitive damages award, which was approximately four times the compensatory damages, does not violate due process.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff had worked for Corporate Express, an office-supplies company catering to businesses, for seven years when Staples, Inc. purchased Corporate Express in June 2008 and renamed the company Staples Contract and Commercial Inc. Plaintiff's job was to manage the physical plant at the Corporate Express fulfillment facility in La Mirada. His duties included general repair and maintenance, equipment maintenance, and security. Plaintiff maintained this supervisory position after Staple's Inc.'s takeover of Corporate Express.

In 2007, Plaintiff began reporting to a new manager, Lionel Marrero. After the 2008 take-over, Marrero worked for Defendants. There was evidence at trial that Marrero was on a mission to cut costs at the La Mirada facility by replacing older, higher paid employees with part-time and temporary employees. His method was to increase the workload for older employees, forcing them into retirement, or "[write] them up" for errors or ethical violations, creating a basis for their termination.

2

At Marrero's direction, human resources reprimanded Plaintiff twice in 2009, first for researching an employee's personal cell phone plan after Defendants stopped issuing company-owned cell phones to employees working under Plaintiff's supervision and second for sending two inappropriate emails to a coworker. Aside from these two infractions, Plaintiff had generally positive performance reviews throughout his time with Corporate Express and Defendants. Prior to the take-over, Plaintiff never received a "[write] up."

In 2011, when Plaintiff was 64 years old, Defendants terminated Plaintiff's employment based on allegations that he stole a bell pepper from the La Mirada facility's cafeteria, which was run by a third-party vender. Plaintiff explained that he entered the cafeteria after hours to evaluate whether the refrigerators were working properly. When he opened the fridge, a salad fell out onto the floor. Plaintiff threw out the salad but ate the bell pepper. He testified in his deposition and at trial that there was an accepted practice of taking food from the cafeteria afterhours and paying for it later. When he was investigated for the theft, Plaintiff reported that he had previously taken three Monster drinks after hours and subsequently paid for them. A cafeteria worker likewise told company investigators that she noticed the drinks missing and that Plaintiff had paid for them. Plaintiff initially stated in a written statement that he forgot to pay for the 68-cent bell pepper but later testified at his deposition and at trial that he did pay for the pepper.

Following his termination, Plaintiff filed this lawsuit against Defendants, alleging age-based discrimination, harassment, and retaliation, breach of express and implied-in-fact contracts, and defamation. Defendants moved for summary judgment, or summary adjudication in the alternative as to each claim. The trial court granted the motion in part, disposing of all causes of action other than age discrimination. Plaintiff tried his age discrimination claim to a jury, who found in his favor and awarded him approximately $3.2 million in compensatory damages and $22.8 million in punitive damages ($13,053,664 against Staples, and $9,790,248 against Staples, Inc.). Defendants filed motions for new trial and for JNOV. Partially granting Staples, Inc.'s motion for JNOV, the court reduced punitive damages to $13 million by striking the punitive damages

3

against Staples, Inc. The court entered judgment jointly against Defendants in the amount of $16,317,080.

## DISCUSSION

Defendants raise five issues on appeal, asserting: (1) insufficient evidence of discrimination, (2) instructional error, (3) prejudicial evidentiary ruling, (4) insufficient evidence of malice, fraud, and oppression, and (5) excessive punitive damages in violation of due process. We address each in turn.

## 1. Substantial Evidence Supports the Jury's Age Discrimination Finding

Defendants argue they were entitled to judgment notwithstanding the verdict (JNOV) because Plaintiff failed to present sufficient evidence that age was a substantial factor motivating Plaintiff's termination. " 'A motion for JNOV may be granted only when there is no substantial evidence to support the verdict, viewing the evidence in the light most favorable to the party securing the verdict. [Citation.] "If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citations.] The court resolves all conflicts in the evidence and draws all reasonable inferences in favor of the verdict. [Citation.] "As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." ' " (*Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391, 1401-1402.)

FEHA prohibits age discrimination by employers against employees. (Gov. Code[1] § 12940, subd. (a).) A plaintiff alleging disparate treatment discrimination has the burden to establish unlawful discrimination by showing that he was a member of the protected age group, he competently performed his job, he was terminated or suffered an adverse employment action, and there was a discriminatory motive for the termination. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).) As to the last prong, "[t]here must . . . be evidence of a causal relationship between the [discriminatory] animus and

---

[1]     All subsequent statutory references are to the Government Code unless otherwise indicated.

4

the adverse employment action." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550 (*DeJung*).)  If the employer shows that its action was taken for a legitimate, nondiscriminatory reason, the plaintiff must show that the employer's reason for termination was pretextual.  (*Guz*, at pp. 355-356.)

Specifically, Defendants contend that there is insufficient evidence of discriminatory animus and persuasive evidence that Defendants based the termination on a legitimate, nondiscriminatory reason:  Plaintiff's unethical behavior and violation of the anti-theft policy.  We reject Defendants' argument that there was a dearth of evidence Plaintiff was fired because of his age.  Based on testimony from Daniel Velasquez, Plaintiff, and other employees, the jury could reasonably find that Marrero was motivated by anti-age animus and Marrero's role in the decision to terminate Plaintiff was a substantial factor causing the termination.

### a.      Discriminatory Animus

Marrero's comments about older employees, made in the context of an intention to eliminate them from the workforce, provided substantial evidence of age-based animus. Plaintiff elicited testimony from Velasquez, a former Staples manager who worked with Plaintiff prior to and at the time of his termination.  Velasquez testified he had witnessed a "concerted attempt to get rid of the higher paid, older workers" following Defendants' take over.  In management meetings, Velasquez heard Marrero talk about the company's desire to push out older employees and heard Marrero say he wanted to find reasons to discharge them.  Specifically, Marrero told the managers to " '[t]ake a closer look at the older people.  They are starting to drag and are slowing down.  If they are not top performers, write them up and get rid of them.' "  Marrero also said, " '[w]e need young energetic people.  Walk around the facility with the older workers and if they cannot keep up then get rid of them.' "  Plaintiff also testified that Marrero made similar ageist comments at managers' meetings.

5

There was evidence of other conversations where Marrero encouraged age-based discrimination with his managers during one-on-one interactions. In a conversation on the warehouse floor, Marrero told Velasquez: " 'We need to get rid of old people because they are slow [and] we can get younger people to work cheaper.' " Velasquez testified that Marrero pulled him aside in management meetings and identified older employees who should be reviewed, suggesting that the older workers were "slow [as] molasses." Marrero encouraged Velasquez to hire younger workers and part-timers, who would be ineligible for benefits. Velasquez testified that Marrero, who answered directly to the Staples, Inc. corporate office in Massachusetts, explained that he was under pressure from the company to cut back on the cost of labor.

Marrero also directly told older workers they were overpaid and inquired about their retirement plans. Velasquez heard Marrero ask a number of older employees: " 'When do you plan on retiring?' " Plaintiff similarly testified that Marrero told him he was overpaid, asked him when he was going to retire, and became agitated when Plaintiff said he had no plans to retire.

Former employees also testified that they and their coworkers were pushed out of their jobs as a result of this discriminatory animus. Velasquez was a supervisor at the La Mirada facility for 17 years and was never written up before his April 2013 termination. After Velasquez suffered a stroke in July 2012 and missed work for medical appointments, Marrero derided Velasquez's requests for medical accommodations. Six months before Velasquez was terminated, Velasquez complained about upper management's employment practices and Marrero's poor treatment. Like Plaintiff, Velasquez was terminated for an apparently trivial reason. When an associate dropped 12 cases of paper, without injuries, Velasquez declined to report the incident because the paper was worth $150 and it was company policy to only report losses over $300. Management suspended and then terminated Velasquez after determining that the full retail value of the paper was more than $300.

6

Jeff Vance, formerly a transportation supervisor for Corporate Express and then for Defendants, testified that Defendants forced him out of his job at age 62 by requiring him to drive a truck and make deliveries, even though he had not delivered packages for 17 years and insisted he was not physically capable of that labor. Keith Scott likewise testified that Defendants assigned excessive tasks to him and other older employees, making it impossible to complete the work in the allotted time. He testified that when he was 66 years-old, Defendants pushed him out of the company.

Gavino Munoz worked at the La Mirada facility for 24 years and was an operations supervisor when Defendants terminated him at the age of 44 years old. Defendants effectuated his termination about six weeks after he reported Marrero's theft of a vendor's bin. At that point in time Munoz was making $65,000 per year. Defendants replaced him with a substantially younger employee. Munoz also testified that Defendants forced out another employee, Anthony Mullinari, who worked at the La Mirada facility for over 25 years as a replenisher, restocking shelves. He stated that when Mullinari was approximately 60 years old, Defendants pressured him with increased restocking goals and forced him out of his job. Munoz also described Yolanda Briones's experience with Defendants. Briones worked at La Mirada facility for over 20 years. When she was about 50 years old and at the top of the pay scale, Marrero participated in having her terminated.

Doritha Evans testified that she worked for La Mirada facility for 28 years. At the time of her discharge, she was a senior restocking associate with a reputation as a good worker. She had never been late or written up before Defendants took over. In 2010, Marrero and another supervisor called Evans into a meeting, told Evans that she was getting older and moving too slowly, and criticized her performance. Although Evans was never behind in her work, they told her that she would be out of a job unless she improved her performance. In other meetings, they said her restocking count was low and forced her to start work at 3:00 a.m. Evans felt compelled to take the severance package they offered her at age 62. Defendants replaced her with a younger, lower paid employee. Evans also testified that she witnessed David Miranda's termination, a fellow

re-stocker with over 28 years tenure at the La Mirada facility. Although Miranda was also a good worker, Defendants involuntarily terminated him while he was in his 50s and replaced him with a younger employee making significantly less money.

The testimony of witnesses Velasquez, Vance, Munoz, and Evans provided substantial evidence of Marrero's discriminatory comments and Defendants' practice of forcing out older workers. This testimony provided ample evidence supporting the court's finding there was substantial evidence of discrimination.

### b. Causation

Defendants argue that Marrero's discriminatory animus cannot support the judgment because "his role in the [decision to discharge Plaintiff] was too limited to establish that he was a cat's paw, and none of his discriminatory comments were made in connection with Plaintiff's termination." The "cat's paw" doctrine allows a Plaintiff to prove causation by "showing that a significant participant in an employment decision exhibited discriminatory animus" even if the ultimate decision maker exhibited no animus. (*DeJung, supra,* 169 Cal.App.4th at p. 551.) This evidence "is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*Ibid.*) Notably, an " ' "individual employment decision should not be treated as a . . . [']watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from . . . every other decision.' " ' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 74.)

Marrero's comments to Plaintiff and his long-time involvement in decisions to discipline and terminate Plaintiff and other older workers established the causal link between the discriminatory animus and Plaintiff's termination. Testimony that Marrero essentially used human resources as his personal tool for disciplining and removing employees, including Plaintiff, provided additional evidence of causation. Velasquez explained that human resources never reprimanded employees unless Marrero gave "the green light" to do so. There was evidence that human resources ignored Marrero's misbehavior while sanctioning other workers for similar behavior. While Plaintiff was

8

disciplined for sending offensive emails, Marrero was not reprimanded for being disrespectful to fellow employees and making crude, inappropriate comments at work. According to Velasquez, it was commonplace for certain employees, including Marrero, to engage in misconduct and not be reprimanded. Unlike Plaintiff, Marrero was not disciplined for his violation of the company's anti-theft policy. Velasquez recalled that after a hazardous spill, Marrero grabbed a large container that belonged to a vendor, and told Velasquez and Munoz to use the container to clean up the spill. Marrero then instructed Velasquez to tell the vender there were three instead of four containers and that the facility had initially miscounted. Munoz objected and told Marrero that this conduct amounted to stealing. Even though an asset protection manager was present and witnessed Marrero's conduct, Marrero suffered no consequences for the theft. Based on this evidence, the jury could reasonably infer that Plaintiff's termination for the alleged theft of a bell pepper was a pretext for unlawful discrimination. The jury could also have reasonably interpreted Marrero's admission at trial that, "it almost seemed ridiculous to terminate for a pepper," as tantamount to an admission that the termination was pretextual.

There is additional evidence that even before the termination, Marrero targeted Plaintiff, substantially increasing Plaintiff's workload, inducing the human resources department to reprimand Plaintiff on multiple occasions, and referring to Plaintiff as an "older goat" and an "old koot." Marrero also questioned Plaintiff about retirement and told him he was overpaid. Marrero admitted he was one of the decision-makers in Plaintiff's termination. Marrero testified that he participated in the decisive termination meeting and that everyone at the meeting "had a voice." Marrero said he did not "go to bat" for Plaintiff and indicated he supported his termination. An email from Matthew Constantino, the Director of West Coast Fulfillment Centers, confirmed that Marrero was among the managers in the conference call when the decision to terminate was made and that the decision was bolstered by the 2009 incidents of discipline initiated by Marrero.

9

Other evidence suggests that Marrero later advocated for Plaintiff's termination. According to Plaintiff, Marrero saw Plaintiff with the bell pepper as Plaintiff left the cafeteria, and heard Plaintiff say he would pay for the pepper the next day. Marrero nonetheless escalated the situation, involving the loss-prevention team and upper management, without finding out whether Plaintiff paid for the pepper or not. Marrero did so knowing that on other occasions, Plaintiff had taken Monster drinks after-hours and later paid for them the next day. Marrero also knew that there was a policy in place at one point allowing Plaintiff to take items after-hours and pay for them later.

Defendants argue that the company's anti-theft policy could not have been a pretext for age-based discrimination because the company's historical enforcement of that policy led overwhelmingly to the discharge of younger, rather than older, employees. This argument focuses too narrowly on Defendants' stated reason for termination. The evidence showed Defendants used a variety of pretexts to push older workers out of the company. Plaintiff also successfully demonstrated inconsistency in Defendants' enforcement of the anti-theft policy, terminating an older worker for theft while excusing Marrero's theft.

We conclude there is ample evidence in the record that Marrero's discriminatory animus was a substantial factor causing Plaintiff's termination. We therefore affirm the trial court's denial of Defendants' motions for JNOV.

**2. The Court Did Not Abuse Its Discretion When Ruling on the Email Evidence**

Defendants complain they were prejudiced when the court declined to order Plaintiff to either search for and produce his personal emails to a former coworker, Mike Bramlett, or be sanctioned with an instruction on willful suppression of evidence. We review the court's decision regarding discovery sanctions for abuse of discretion. (*American Home Assurance Co. v. Société Commerciale Toutélectric* (2002) 104 Cal.App.4th 406, 435 ["The court's discretion to impose discovery sanctions is broad, subject to reversal only for manifest abuse exceeding the bounds of reason."]; *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991.) We reverse if Defendants demonstrate that the court's ruling was prejudicial; but for the purported

10

error, Defendants would have obtained a more favorable outcome. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282 [stating that "[appellants] fail to demonstrate how any claim of error in the trial court's exclusion of evidence would have made any difference in the outcome"].)

In pretrial discovery, Defendants demanded production of "written communications between [Plaintiff] and any current or former employee . . . of [Defendants] concerning the allegations of [the Complaint]," and "all notes, cards, emails, or other DOCUMENTS which [Plaintiff] ha[s] received from any current or former [Defendants'] employee." Plaintiff objected to the requests but represented he had "conducted a diligent search and a reasonable inquiry and determined that [P]laintiff is not in possession, custody, or control of such documents. Plaintiff is unaware if such documents exist." During trial, Defendants learned that Plaintiff had possession of email correspondence between Plaintiff and Bramlett, a current employee of Defendants. While questioning Bramlett, Plaintiff used seven pages of Bramlett's emails to Plaintiff (Exhibit 278) to refresh Bramlett's memory while on the stand. In the emails, Bramlett mocked and criticized Defendants and Marrero. The trial court refused Plaintiff's request to admit the emails into evidence because they contained inflammatory comments. Defendants' counsel did not cross-examine Bramlett or question Plaintiff about the emails or the circumstances under which he discovered them.

Subsequently, Defendants filed a bench brief, asking the court to order Plaintiff to produce unredacted copies of his complete email exchange with Bramlett and to instruct the jury that it could draw an adverse inference against Plaintiff for wrongfully withholding the emails. Defendants asserted Plaintiff withheld these email communications and failed to honestly respond to discovery requests regarding email communications between Plaintiff and Defendants' employees. The court declined to order Plaintiff to engage in discovery during the trial, but ordered Plaintiff to allow Defendants to review the emails used to refresh the witness's memory. The court considered future production of the unredacted emails unnecessary because it denied Plaintiff's request to admit Bramlett's emails into evidence.

11

We conclude that the trial court did not abuse its discretion in denying Defendants' request. Although Defendants had the opportunity to cross-examine Bramlett, or question Plaintiff in order to establish the existence of Plaintiff's reply emails and how he came into possession of Bramlett's emails, Defendants declined to do so. There is accordingly no evidence of how or when Plaintiff retrieved the Bramlett emails and no evidence Plaintiff had possession of his own emails and willfully suppressed them. (See Evid. Code, § 413 ["In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by *his testimony* such evidence or facts in the case against him, or *his willful suppression of evidence* relating thereto, if such be the case."], (italics added); BAJI 2.03.) Defendants have also failed to demonstrate that unproduced emails contain any evidence favorable to Defendants. There is accordingly no evidence that Defendants suffered any prejudice. In fact, the court exercised its discretion to prevent prejudice by excluding emails that were harmful to Defendants' case.

Based on the foregoing, we conclude that the court did not abuse its discretion in refusing to order Plaintiff to produce additional email correspondence and declining to admonish the jury.

**3.    The Disparate Impact Instruction Was Harmless Error**

Defendants assert that the court committed reversible error by giving Plaintiff's requested instruction on disparate impact. We review de novo whether the court erred in issuing this instruction to the jury. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845.) "Where it is contended that the trial judge gave an erroneous instruction, we view the evidence in the light most favorable to the claim of instructional error." (*Ibid.*) We only reverse the judgment if it is reasonably probable that defendant would have obtained a more favorable result had the erroneous instruction not been given. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570.) "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether

12

respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Id.* at pp. 570-571.)

Here, the court instructed the jury in accordance with Government Code section 12941 ("[t]he use of salary as a basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criteria adversely impacts older workers as a group"). Defendants argue it was error to give the instruction in a disparate treatment case. Disparate treatment claims address intentional discrimination directed to the Plaintiff as where "an employer has treated a particular person less favorably than others because of the plaintiff's . . . protected category." (*Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 893 (*Rosenfeld*).) Disparate impact claims address mass layoffs and other facially neutral policies that unfairly impact protected classes. "A claim of *disparate impact* differs from a claim of disparate treatment in that a plaintiff is not required to prove discriminatory motive when claiming disparate impact. Disparate impact exists where, '*regardless of motive*, a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on members of the protected class.' " (*Ibid.*)

The instruction indentified salary as a basis for differentiating between employees as a policy that may have a disparate impact on older employees. While it was a correct statement of law, the disparate impact instruction was improper because it invited the jury to find Defendants liable for age discrimination without finding discriminatory intent, as required in a disparate treatment case. (*Rosenfeld, supra,* 226 Cal.App.4th at p. 893.) We agree with Defendants that the court erred in reading a disparate impact instruction to the jury.

13

Nonetheless, we conclude that the error was harmless. As set forth in the first section of the Discussion, there is ample evidence of discriminatory intent in the record. Velasquez, Plaintiff, and other employees testified to Defendants' discriminatory animus. Plaintiff's closing argument focused on disparate treatment rather than disparate impact and urged the jury to find discriminatory intent as a substantial motivating factor in Plaintiff's termination. The court also read CACI 2500, stating Plaintiff had to prove that his "age was a substantial motivating reason for defendant's decision to discharge plaintiff." Following deliberations, the jury expressly found that Plaintiff's age was "a substantial motivating reason for [Defendants'] decision to discharge him." There is accordingly no evidence in the record that the jury was confused by the erroneous instruction or failed to make the necessary finding of discriminating animus.

We conclude Defendants did not suffer prejudice as a result of the erroneous instruction. It is not reasonably probable Defendants could have obtained a more favorable result without this error.

## 4.     Substantial Evidence of Malice and Oppression Supports the Punitive Damages Award

Staples[2] argues Plaintiff failed to provide clear and convincing evidence of malice, oppression, or fraud in support of the punitive damages award. We review the jury's punitive damages finding for substantial evidence. (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34.) "Punitive damages are properly awarded 'when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.' " (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 428.) "Punitive damages can be awarded only where the jury finds oppression, fraud, or malice by clear and convincing evidence. (Civ.Code, § 3294, subd. (a).)" (*Stewart,* at p. 34.)

---

[2]     We address punitive damages pertaining solely to Staples Contract and Commercial, Inc. because the trial court partially granted Staples, Inc.'s motion for JNOV, striking the punitive damages award against Staples, Inc.

Pursuant to the Civil Code, "malice" is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) "The adjective 'despicable' used in section 3294 refers to 'circumstances that are "base," "vile," or "contemptible." ' " (*Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912 (*Cloud*).)

Courts have upheld findings of malice and oppression in cases similar to this one, where the employer discriminated against the employee, denied an employee's rights under FEHA, and attempted to conceal its discriminatory behavior. In *Cloud, supra,* 76 Cal.App.4th at pages 900-901, a female employee was passed over for promotion because of her gender. The Court of Appeal affirmed the jury's award of punitive damages, concluding that substantial evidence showed that the employer acted with malice: "The jury could properly conclude that the corporations intentionally discriminated by denying [the plaintiff] a promotion based on gender, then attempted to hide the illegal reason for their decision with a false explanation, and that in this, they acted in a manner that was base, contemptible or vile." (*Id*. at p. 912.) The court reasoned that the discriminatory employment decision denied the plaintiff her right under FEHA to seek, obtain, and hold employment free from sexual discrimination. (*Ibid*.) The court further noted that the decision-maker's concealment of the unlawful basis of its adverse employment action and pretextual explanation further supported the jury's findings of oppression. (*Ibid*.)

*Stephens v. Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394 (*Stephens*), an age discrimination case involving a 63-year-old plaintiff, is also instructive. After the supervisor in that case discovered the plaintiff had no plans to retire, the supervisor "engaged in a program of unwarranted criticism of [the] plaintiff's job performance to justify [the] plaintiff's demotion." (*Id.* at pp. 1398, 1403, disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.) The

15

court found the unwarranted criticism was oppressive behavior because it had no factual justification, damaged the plaintiff's reputation, and subjected the plaintiff to embarrassment. (*Stephens,* at pp. 1403–1404.)

Likewise here, the jury heard substantial evidence Staples purposefully terminated Plaintiff because of his age, damaged his reputation, and tried to conceal the discrimination. By discharging him based on the bell pepper incident, Staples labeled him a thief, effectively damaging Plaintiff's reputation and future job prospects. A jury could reasonably conclude that Staples had engaged in malice—intentionally hurting Plaintiff through this adverse employment action, motivated by discrimination. Substantial evidence also supports a finding that Staples acted in a base, contemptible, and vile manner when it attempted to conceal the illegal reason for the firing. The evidence that Defendants used the theft as a pretext to deny Plaintiff his right to hold employment free from age discrimination was sufficient for the jury's finding of oppression.

In sum, substantial evidence of malice and oppression supports the punitive damages award.

## 5. The Punitive Damages Award Does Not Violate Due Process

Lastly, Staples asserts that the punitive damages award "is grossly excessive and violates due process." In *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 (*Simon*), our Supreme Court explained, "the due process clause of the Fourteenth Amendment to the United States Constitution places limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards. [Citations.] The imposition of 'grossly excessive or arbitrary' awards is constitutionally prohibited, for due process entitles a tortfeasor to ' "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." ' [Citation.]" We review the constitutionality of the punitive damage award de novo. (*State Farm Mut. Ins. v. Campbell* (2003) 538 U.S. 408, 418 (*State Farm*).) On appeal, we make "an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the

16

plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.]" (*Simon*, at p. 1172.) Nonetheless, we still give deference to findings of historical fact made in the trial court. (*Ibid*.)

We consider three guideposts when reviewing a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra,* 538 U.S. at p. 418; *Simon, supra,* 35 Cal.4th at p. 1172.)

*a.        Degree of Reprehensibility*

The degree of reprehensibility is the most important guidepost in the analysis. (*State Farm, supra,* 538 U.S. at p. 419; *Simon, supra,* 35 Cal.4th at p. 1180.) To determine the degree of Staples' reprehensibility, we consider whether: " 'the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Simon,* at p. 1180.)

As to the first factor, although the harm to Plaintiff was mostly economic, Plaintiff also suffered physical harm because the termination impacted Plaintiff's emotional and mental health. (*See Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 713 (*Roby*) [discriminatory discipline toward employee resulted in emotional harm]; see also *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 965 [bad faith denial of policy benefits caused emotional distress and indifference to insureds' health and "peace of mind"].) With respect to the second factor, it is reasonable to infer that Staples's discriminatory treatment, which resulted in Plaintiff losing his job and being branded a thief, also harmed Plaintiff's emotional well-being. It is therefore reasonable to conclude that Staples was indifferent to or recklessly disregarded Plaintiff's health and well-being during the events leading up to and including his termination. The third factor is likewise

17

present because Plaintiff was financially vulnerable when he was terminated because his job provided two-thirds of his family's income and Staples's grounds for discharge marred Plaintiff's professional reputation, making it more difficult to find new employment. Without employment, Plaintiff and his family could no longer afford to live in California, and were forced to move to Idaho.

The fourth factor is supported by evidence of repeated incidents of discriminatory behavior. Marrero engaged in a series of disciplinary actions against Plaintiff motivated by discrimination and made numerous ageist comments. He issued "write ups" and forced other employees out of their jobs in an effort to reduce costs for Staples. Testimony from the other employees that they too were pushed out of their jobs showed a pattern and practice of age discrimination, motivated by a desire to employ a younger, less expensive work force. (Cf. *Roby, supra,* 47 Cal.4th at pp. 692–693, 719–720 [reducing a compensatory damage award from $3.5 million to $1.4 million and reducing punitive damages from $15 million to $1.9 million, a ratio of one to one, because the employer's wrongdoing with respect to discrimination was limited to its one-time decision to adopt a strict attendance policy that did not reasonably accommodate employees who had medical conditions that might require unexpected absences].)

Lastly, the harm here can reasonably be construed to be the result of intentional malice, as Staples sought to reduce the cost of its operations by systematically removing older, higher-paid employees, specifically Plaintiff in this case, through discriminatory disciplinary actions. A group of managers participated in the final decision to terminate Plaintiff's lengthy and successful employment at the La Mirada facility over a bell pepper, despite the confusion surrounding whether Plaintiff had actually stolen it and whether he had permission to take food and pay for it later. In so doing, Staples rendered Plaintiff jobless and incapable of obtaining new employment due to his now-tarnished professional reputation. In addition, the record indicates that the discriminatory firing was undertaken in order to reduce overhead costs and make Staples more profitable. This motivation likewise increases Staples' reprehensibility. (*Exxon Shipping Co. v. Baker* (2008) 554 U.S. 471, 494 ["Action taken or omitted in order to augment profit represents

18

an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure."].)

Taking into account all five reprehensibility factors, the evidence supports a finding that Staples acted with a high degree of reprehensibility, justifying imposition of punitive damages.

### b. Disparity Between the Compensatory and the Punitive Damages

Next, we analyze "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." (*State Farm, supra*, 538 U.S. at p. 418.) "California published opinions on this issue have adopted a broad range of permissible ratios–from as low as one to one to as high as 16 to one–depending on the specific facts of each case." (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 88 (*Bankhead*); accord, *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1312-1313.) In *Simon, supra,* 35 Cal.4th at page 1182, the California Supreme Court explained that when the ratio of punitive damages to compensatory damages is significantly greater than nine or 10 to one, the punitive damages award is suspect under federal due process. In the absence of some special justification, such as extreme reprehensibility or unusually small compensatory damages, punitive damages based on double digit multipliers cannot survive appellate scrutiny under the due process clause. (*Ibid*.) Here, the jury awarded Plaintiff $3.2 million in compensatory damages and the court reduced punitive damages to $13 million. Thus, the punitive award was about four times the compensatory damages and not presumptively unconstitutional pursuant to the standard set forth in *Simon*.

Staples nonetheless argues that the multiplier of four was too high because the compensatory damages included a punitive component. In general, "[m]ultipliers less than nine or 10 are not . . . presumptively valid . . . . Especially when the compensatory damages are substantial or already contain a punitive element, lesser ratios 'can reach the outermost limit of the due process guarantee.' " (*Simon, supra,* 35 Cal.4th at p. 1182, italics omitted; *Bankhead, supra,* 205 Cal.App.4th at p. 90 ["The inclusion of a punitive element in emotional distress damages reduces the permissible ratio of punitive to

compensatory damages."].) " '[D]ue process permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element than [it does] between punitive damages and a substantial compensatory award for emotional distress; the latter may be based in part on indignation at the defendant's act and may be so large as to serve, itself, as a deterrent.' " (*Roby, supra,* 47 Cal.4th at p. 718, quoting *Simon, supra,* 35 Cal.4th at p. 1189.) Specifically, Staples asserts that significant disparity between the noneconomic damages and the harm suffered by Plaintiff necessarily indicate that the noneconomic damages were punitive in nature. We disagree as ample evidence of Plaintiff's emotional distress as well as the circumstances surrounding the jury's verdict demonstrate that the compensatory award was not punitive.

Plaintiff's wife testified that following the Staples takeover, Plaintiff's work time increased substantially, and Plaintiff was constantly taking work phone calls during his time off. Plaintiff meanwhile was distressed to see Staples targeting and terminating older employees, and lived in fear that he too would be targeted. He became anxious and preoccupied with his job. Plaintiff's wife testified that toward the end of his employment with Staples, Plaintiff withdrew from his family and was "consumed with this fear of losing his job and not being able to provide for us." She described him as very distracted, annoyed, and short-tempered. Following his termination, Plaintiff was devastated, a "broken spirit," and "just a shell of who he had been." After termination, he was depressed, anxious, lost confidence in himself, and gained a lot of weight. Plaintiff also stopped enjoying his daily activities, like working out, and spending time with his family.

Plaintiff's daughter similarly testified that she witnessed a drastic change in her father's personality following the Staples takeover. According to his daughter, Plaintiff was withdrawn, and constantly nervous and anxious. When Plaintiff lost his job, she saw him become increasingly depressed and gain a lot of weight. Her father spent his days looking for jobs online and watching television rather than actively enjoying life as he used to.

20

Medical doctors also attested to the harmful impact of Staples' discrimination on Plaintiff. In 2009, Plaintiff's primary care physician diagnosed Plaintiff with anxiety caused by his work problems, and prescribed Plaintiff one bottle anti-anxiety medication for the work-related anxiety. Furthermore, Plaintiff's expert, a forensic psychiatrist, determined Plaintiff suffered from major depressive disorder and diagnosed Plaintiff secondarily with generalized anxiety disorder. The expert also stated that although he did not make the diagnosis of post-traumatic stress disorder (PTSD), Plaintiff suffered from a number of symptoms consistent with PTSD. The expert testified that Plaintiff had been symptomatic of depression and anxiety for two years prior to his termination. These symptoms included anhedonia, a loss of pleasure or gratification from his usual everyday activities.

At the time of the termination, Plaintiff exhibited "an overt feeling of depression, sadness, discouragement." The expert explained that this meant Plaintiff was "very, very unhappy" about his life and did not have confidence that his life was going to improve. The expert stated that it was difficult for Plaintiff to recover from the event because Plaintiff did not perceive the discriminatory firing as a natural consequence of his employment and because Plaintiff had no control over the situation. As a result, Plaintiff felt and would continue to feel discouraged and pessimistic about his life improving. Following the termination, Plaintiff exhibited symptoms of major depression including a change in sleep patterns, loss of appetite, sense of fatigue, feelings of guilt, difficulty with memory and concentration, and a foreshortened sense of the future. In addition, Plaintiff exhibited symptoms of generalized anxiety. He was fearful about the future, irritable, restless, edgy, physically tense, and unable to calm himself down when he became anxious. Plaintiff also felt guilty that his wife had to work and that his failure to provide for the family meant that his family had to move to Idaho because they could no longer afford to live in California.

The expert testified that Plaintiff was still suffering from depression and anxiety when he had met with him two months before the February 2014 trial, although it was not as intense as the depression he felt when he was terminated. According to the expert, Plaintiff was still angry and inhibited about going out in public and socializing. At the time of trial, Plaintiff exhibited an "avoidance symptom," meaning that he avoided anything that reminded him of what happened because the discriminatory events caused him pain.

In addition to this evidence regarding the severity of his emotional distress, the circumstances surrounding the jury's determination also indicate that the noneconomic damages were not punitive. Notably, the jury awarded Plaintiff less damages for emotional distress than Plaintiff requested. In his closing argument, Plaintiff's counsel asserted that the jury should award $3.2 million for past noneconomic damages and $2.4 million for future noneconomic damages. The jury in fact awarded Plaintiff $2.4 million in noneconomic damages ($1.6 million for past noneconomic damages and $800,000 for future noneconomic damages). The fact that the jury's award of noneconomic damages was less than half of Plaintiff's requested amount indicates that the jury contemplated the significance of Plaintiff's emotional injuries and reduced the suggested noneconomic damage award accordingly.

Moreover, the trial was not bifurcated and court instructed the jury about the purpose of compensatory and punitive damages. As to the compensatory damages, the court told the jury that it must "award damages that will reasonably and fairly compensate" Plaintiff for his physical and emotional injuries caused by Defendants. The court explained to the jury that if it found that Defendants caused Plaintiff harm, the jury must then decide whether that conduct additionally justifies an award of punitive damages. The court stated, "[t]he purpose of punitive damages are [*sic*] to punish a wrongdoing for the conduct that harmed the Plaintiff and to discourage similar conduct in the future." Thus, based on the instructions provided by the court, the jury was aware that it could punish Staples using punitive damages, independent of its award for emotional distress damages, which was to be entirely compensatory in nature. We

22

presume that the jury understood and followed these instructions in assessing the compensatory and punitive awards. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."].)

To the extent Staples cites *Roby* and *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th 965 (*Walker*) to support its argument that punitive damages must be reduced in light of the large noneconomic damage award, these cases are distinguishable. The appellate court reduced the punitive damages largely because the defendant employer exhibited "relatively low reprehensibility" in *Roby*, and because the reprehensibility factors were not present in *Walker*. (*Roby, supra,* 47 Cal.4th at p. 718; *Walker* at p. 974-975.) As stated above, reprehensibility is the most important guidepost in the analysis. Unlike *Roby* and *Walker*, reprehensibility was abundant in the case at bar and weighed in favor of greater punitive damages.

We conclude that the noneconomic damages award does not appear to be punitive in nature, as it is supported by evidence of Plaintiff's emotional and mental harm and by the circumstances surrounding the jury's determination. This guidepost indicates that the multiplier of four was not unconstitutionally high under this set of facts.

    *c.    Difference Between the Punitive Damages and Civil Penalties*

Lastly, we examine "the relationship between the award and civil penalties authorized for comparable conduct." (*Simon, supra,* 35 Cal.4th at p. 1172.) Staples asserts that the punitive damages award was excessive in comparison to possible civil penalties for FEHA age discrimination cases. Staples contends that the "$13 million award was 87 times greater than the maximum fine of $150,000 that the Fair Employment and Housing Commission could impose." Staples fails, however, to cite any competent authority capping penalties at $150,000.

Based on our research, the former cap on punitive and emotional distress damages for cases prosecuted by the Fair Employment and Housing Commission, no longer applies. (See former § 12970(a)(3), (5).) In 2012, the Legislature repealed section 12970 with Senate Bill No. 1038 (2011-2012 Reg. Sess.) chapter 46, page 3. That bill

23

eliminated the Fair Employment and Housing Commission and transferred its duties to the Department of Fair Employment and Housing (DFEH). In repealing section 12970 and enacting laws for the DFEH, the bill did not create a new punitive damages or civil penalties cap for employment discrimination actions brought by DFEH. As there is no maximum civil penalty to which we can compare the jury's punitive award, this guidepost is "essentially irrelevant" and cannot inform our due process analysis. (*Bankhead, supra,* 205 Cal.App.4th at p. 85, fn. 10.)

> d.     *Allegations of Counsel's Misconduct*

Before summarizing our conclusions on the three guideposts, we address Staples' due process arguments. Without reference to the three guideposts, Staples asserts that improper comments by Plaintiff's counsel during closing argument caused the unconstitutionally large disparity between the jury's award of compensatory and punitive damages. First, Staples asserts that Plaintiff's counsel encouraged the jury to punish Staples for nationwide misconduct. However, Staples never objected to counsel's statements and is therefore deemed to have waived its objections. "Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citations.] The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial. 'It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' [Citation.] In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice." (*Horn v. Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610.)

Staples asserts that it was not necessary to object at trial, citing *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 355, which approved the reduction of damages "even in the absence of an objection and request for admonition, where there are flagrant and repeated instances of misconduct, an appellate court cannot refuse to recognize the misconduct." However, the conduct in *Simmons* was far more egregious because "plaintiffs' counsel from the very beginning of the trial embarked on a campaign of hate, vilification and subterfuge for the sole purpose of prejudicing the jury against defendant . . . and its employees." (*Id*. at p. 351.) Counsel abused defense witnesses by accusing them of wrongful conduct with no factual basis. Counsel also told the jury that the defendant railroad would lie, cheat, steal, thieve, elicit and suggest perjury during trial, that the railroad believed pedestrians should be damned when it came to protecting them from train accidents, and the railroad preferred older victims of train accidents because the damage awards were lower. (*Id*. at pp. 351-352.) Counsel encouraged the jury to award compensatory damages so large that they would be punitive in nature. (*Id*. at p. 354-355.) Here, Staples complains of several discrete statements made in closing argument. Under these circumstances, Staples's failure to object to comments about Staples's nationwide misconduct effectuated waiver of that issue.

Staples also asserts that Plaintiff's counsel impermissibly urged to the jury to award an 18:1 ratio of punitive damages to compensatory damages, and that this misconduct resulted in an unconstitutionally high punitive damages award. Staples overstates the evidence. During closing arguments, Plaintiff's attorney explained to the jury (without objection) that there are constitutional limits on how much punitive damages the jury could award. He stated that when evaluating whether the amount of punitive damages violates due process, courts look at the ratio of punitive to compensatory damages. Plaintiff's attorney stated that each case is different, and that in one case the court "talked about a potential for 18 to 1 compensatory damages, in other words, 18 times [the compensatory damages]." At that point, Staples objected without specifying any basis for its objection. The court responded: "Well, the jury is not going to be instructed on any ratio. This is merely counsel's argument."

25

Plaintiff's counsel then continued, reiterating that this was argument and explaining that in the particular case he was referring to, the court found the 18 to 1 ratio was okay. Without objection, counsel further stated: "The case down in San Diego against Ralphs, sexual harassment case, the court said a 6 to 1 ratio was okay. We are not seeking as high of those ratios . . . but we are asking as against the Defendant for a 3 to 1 ratio, claim of compensatory damage award times 3 on this form as against Staples, Inc. primarily to punish and deter. $18,000,000 award and a 2 to 1 ratio as against Contract & Commercial, $12,000,000 punishment." Plaintiff's counsel then told the jury that they had the discretion to decide what to award.

We conclude that this portion of the closing argument did not urge the jury to award 18 to one punitive damages. Rather, Plaintiff's counsel encouraged the jury to use a multiplier of two to assess punitive damages against Staples. As explained above, that multiplier is not presumptively unconstitutional. As to counsel's statements about the jury's award in the Ralph's case, Defendants failure to object effectuated a waiver of any contention about those statements. Based on Plaintiff's closing argument, we find no reason to reverse or reduce the award of punitive damages.

        *e.*         *The Guideposts Warrant Affirmance of the Punitive Damages Award*

Based on the foregoing, we conclude that Staples' high degree of reprehensibility, the most important guidepost in our analysis, supports the level of punitive damages awarded by the jury here. The ratio of four to one punitive to compensatory damages is not presumptively unconstitutional and appears supported by the evidence, especially given the reprehensibility involved. Moreover, the compensatory award does not appear to be punitive, and thus the verdict does not doubly punish Staples. Based on our review of the guideposts, we conclude that the jury's award of punitive damages was within the maximum award permitted by the constitution. Therefore, we affirm the punitive damages award.

26

## DISPOSITION

The judgment is affirmed on all grounds.  Plaintiff Bobby Dean Nickel is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

HOGUE, J.[*]

I concur:

ALDRICH, Acting P. J.

LAVIN, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27